```
1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2
      - - - - - - - - - - - - - - - x
3     THE UNITED STATES OF AMERICA,
                                          Criminal Action No.
4                   Plaintiff,           1:21-cr-00072-CRC-1
                                          Friday, December 17, 2021
5     vs.                                 10:00 a.m.

6     GRACYN DAWN COURTRIGHT,

7                   Defendant.
      - - - - - - - - - - - - - - - x
8

9     _____

10                TRANSCRIPT OF SENTENCING HEARING
         HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                  UNITED STATES DISTRICT JUDGE
      _____

12    APPEARANCES:

13    For the United States:       RACHEL A. FLETCHER, ESQ.
                                    U.S. ATTORNEY'S OFFICE
14                                  555 4th St, NW
                                    Washington, DC 20350
15                                  (202) 252-7093
                                    rachel.fletcher@usdoj.gov
16

17    For the Defendant:           THOMAS ABBENANTE, ESQ.
                                    888 17th Street, Suite 1200
18                                  Washington, DC 20006
                                    (202) 223-6539
19                                  tabbenante@aol.com

20

21    Court Reporter:              Lisa A. Moreira, RDR, CRR
                                    Official Court Reporter
22                                  U.S. Courthouse, Room 6718
                                    333 Constitution Avenue, NW
23                                  Washington, DC  20001
                                    (202) 354-3187

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Good morning, Your Honor.
 3   This is Criminal Case Year 2021-072, United States of
 4   America vs. Gracyn Dawn Courtright.  The probation officer
 5   is Aidee Gavito.
 6              Counsel, please come forward to introduce
 7   yourselves for the record, beginning with the government.
 8              MS. FLETCHER:  Good morning, Your Honor; Rachel
 9   Fletcher for the United States.
10              THE COURT:  Good morning, Ms. Fletcher.
11              MR. ABBENANTE:  Good morning, Your Honor; Thomas
12   Abbenante on behalf of Ms. Courtright.  She's present, as is
13   her father, her mother, and her twin sister.
14              THE COURT:  Okay.  Good morning, everyone.
15              MR. ABBENANTE:  And I want to let the Court know,
16   I viewed the digital reports for the COVID tests that they
17   took two days ago.  They were all negative.  They also
18   brought today their rapid test results, which I viewed, and
19   they're all negative.
20              THE COURT:  That's fine.  Thank you.
21              Welcome, folks.
22              Mr. Courtright, I understand you're an attorney;
23   is that correct?
24              MR. COURTRIGHT:  Yes, Your Honor; Charleston, West
25   Virginia.
```

```
 1                THE COURT:  And what's your practice?

 2                MR. COURTRIGHT:  A general practice, a little bit

 3     of everything in a rural area.

 4                THE COURT:  Well, it's good to have someone

 5     keeping an eye out on Mr. Abbenante.

 6                All right.  Welcome, everyone.  We're ready to

 7     proceed?

 8                MS. FLETCHER:  Yes, Your Honor.

 9                THE COURT:  All right.  I've read all of the

10     documents, the presentence investigation report, and both of

11     the memoranda in aid of sentencing.  I did not see any

12     letters of support, Mr. Abbenante.

13                MR. ABBENANTE:  No, Your Honor.

14                THE COURT:  Okay.  Anything else for the Court's

15     review?  Any other written materials?

16                MR. ABBENANTE:  Not on behalf of Ms. Courtright.

17                THE COURT:  All right.

18                Let's start with the factual findings in the

19     presentence investigation report.  Any objections to the

20     description of the offense or the defendant's background?

21                MS. FLETCHER:  Your Honor, no objection to the

22     facts in the presentence report except as noted in Footnote

23     4 of the government's sentencing memorandum.

24                The sentencing report incorrectly applies a

25     specific offense characteristic.  It says that the trespass
```

1    occurred at a secure government facility rather than at a

2    restricted building or grounds; so I think that's just a

3    small misstatement.  The presentence report does correctly

4    reference the provision in Paragraph 89.

5            THE COURT:  We'll get to the guidelines

6    calculation, but the two-point enhancement still applies?

7            MS. FLETCHER:  Yes, Your Honor.  I think it's just

8    the wrong language that's captured in that portion.

9            THE COURT:  Duly noted.

10            All right.  Ms. Courtright, have you had a chance

11    to review the presentence report with Mr. Abbenante?

12            THE DEFENDANT:  Yes, Your Honor.

13            THE COURT:  And have you been satisfied with his

14    services in this case?

15            THE DEFENDANT:  Yes, Your Honor.

16            THE COURT:  All right.  Hearing no objection, the

17    Court accepts the factual findings in the PSR regarding the

18    circumstances of the offense; and, therefore, those facts as

19    stated in the PSR will be adopted by the Court for purposes

20    of sentencing.

21            Moving to the calculation of the sentencing

22    guidelines range.  The defendant pled guilty to one count of

23    entering and remaining in a restricted building in violation

24    of 18 USC 1752(a)(1).  There's a statutory maximum of six

25    months, supervised release of up to one year, up to a

1    $100,000 fine and a $25 special assessment.

2           The probation office calculated the guidelines

3    range as follows using the trespass guideline at Section

4    2B2.3 of the guidelines manual.  The offense carries a base

5    offense level of 4, was increased by two points for the fact

6    that the trespass took place in a restricted building -- is

7    that right, Ms. Fletcher?

8           MS. FLETCHER:  Yes, Your Honor.

9           THE COURT:  -- and reduced by two points for the

10    defendant's acceptance of responsibility for a total offense

11    level of 4.

12           Ms. Courtright has no criminal history, which

13    places her in Criminal History Category 1.  Level 4 at

14    Criminal History Category 1 results in a sentencing

15    guidelines range of zero to six months, and six months is

16    the statutory maximum.

17           Pursuant to the plea agreement, the defendant has

18    also agreed to pay restitution in the amount of $500 to the

19    Architect of the Capitol to help compensate for the damage

20    of the Capitol.  Did I get that --

21           MR. ABBENANTE:  Your Honor, I think the statutory

22    maximum on the offense itself is one year, not six months.

23           THE COURT:  Okay.  Very well.  Thank you.

24           All right.  Other than that, any objection to the

25    calculation and the range?

1          MS. FLETCHER:  No, Your Honor.

2          MR. ABBENANTE:  No, Your Honor.

3          THE COURT:  Okay.  And the probation office has

4    recommended a sentence of one month incarceration, one year

5    supervised release, and 60 hours of community service.

6          Ms. Fletcher, would you like to address the

7    3553(a) factors?

8          MS. FLETCHER:  Yes, Your Honor.

9          And would Your Honor prefer if I kept --

10         THE COURT:  You can take your mask off, yes.

11         MS. FLETCHER:  Thank you.

12         And, Your Honor, the government does not want to

13    belabor everything presented in its sentencing memorandum

14    but would like to highlight the most salient points

15    underlying its request for a sentence of six months of

16    incarceration, one year of supervised release, 60 hours of

17    community service, and the agreed-upon $500 restitution.

18    And before turning to the sentencing factors, the government

19    would like to note a few things.

20         First, I'd like to make clear, to the extent that

21    the government references social media posts or statements

22    by Ms. Courtright, this case is not about the First

23    Amendment.  The government is not seeking to punish her

24    based on her opinions or her statements but do believe they

25    are important in the context of her overall actions that day

1    and provide a window into her state of mind, including

2    acceptance of responsibility and remorse and how she

3    broadcasted those statements far and wide via social media.

4         THE COURT:  On that point, the government has

5    noted a couple of social media posts made I think soon after

6    January 6th.  Have there been any postings in the last

7    almost year since then that the government feels are

8    problematic in any way?

9         MS. FLETCHER:  Not problematic to the -- they're

10   not related to January 6th.

11        THE COURT:  Okay.

12        MS. FLETCHER:  The government is not aware of any

13   such postings.

14        THE COURT:  Okay.

15        MS. FLETCHER:  Second, as noted in the

16   government's memorandum, actual footage of Ms. Courtright on

17   the Senate floor was not located until after she pled

18   guilty, and, pursuant to the plea agreement, the government

19   is not seeking to charge her with additional offenses but

20   does believe that her presence on the Senate floor is

21   relevant to her conduct that day and ask that it be

22   considered in sentencing.

23        THE COURT:  Okay.  On that point, is there any

24   suggestion that she concealed the fact or did not disclose

25   the fact that she had entered the Senate floor?  It seems

1    that she referenced it in a social media post that the

2    government had access to.  Is that fair?

3            MS. FLETCHER:  That's fair, Your Honor.  She did

4    have a conversation in a social media post where she

5    referenced being on the floor.  The government early on --

6    this was one of the earlier arrests in the Jan. 6th riots,

7    and the government was at first unable to locate footage of

8    her but did subsequently locate the footage.  So there --

9    and she admitted to this conduct when she spoke with law

10   enforcement after her plea agreement.

11           THE COURT:  Okay.  And I take it the government

12   could have charged her with an obstruction offense after her

13   plea, or no?

14           MS. FLETCHER:  Your Honor, the plea agreement did

15   preclude any further crimes except crimes of violence.

16           THE COURT:  Even if the government later came into

17   possession of additional evidence?

18           MS. FLETCHER:  Yes, Your Honor.

19           THE COURT:  Okay.

20           MS. FLETCHER:  But --

21           THE COURT:  And staying on that point, how long

22   was she on the floor?

23           MS. FLETCHER:  Your Honor, it's hard to tell

24   because the camera that captures her on the Senate floor is

25   panning to multiple people on the floor.  But it does appear

1    she enters the floor sometime at about 3:04 p.m., and by the

2    time the camera pans back at around 3:06 she's already gone,

3    so the government estimates it's somewhere around the one-

4    minute mark.

5              THE COURT:  Okay.  So she left the building

6    entirely at 3:06, so it had to be less than two minutes.

7              MS. FLETCHER:  Yes.

8              THE COURT:  Okay.  And has the government charged

9    everyone who stepped on the floor for a minute with the

10   obstruction felony?

11             MS. FLETCHER:  And, Your Honor, it's difficult to

12   say because there's so many different factors that go into

13   the obstruction felony.  It's not just -- the mere presence

14   on the floor is not the only factor the government looks to

15   in its charging decisions.

16             But what I will say is had the government had this

17   footage beforehand it is extremely likely that, based upon

18   her other conduct, including carrying the sign and her

19   statements on social media afterwards, that the government

20   would likely have charged her with this offense.

21             THE COURT:  How is carrying the sign and posting

22   the posts that she did in addition to being on the floor for

23   a minute supportive of the obstruction charge?

24             MS. FLETCHER:  I think there -- as I said, there

25   are a number of factors that go into the obstruction charge.

1    It's not just the presence, but it also has to do with an

2    intent element; and so her statements after the fact,

3    particularly about infamy and thinking it's historic and

4    other statements, kind of go towards intent.

5              THE COURT:  Okay.

6              MS. FLETCHER:  And then third, the government did

7    submit a number of photos in its sentencing memo and doesn't

8    intend to have a technical presentation today, but the

9    government does have any videos referenced or those photos

10   available, if Your Honor would like to see them.

11             THE COURT:  All right.  One more question on

12   entering the floor.  Do you think she knew where she was

13   when she went in there?

14             MS. FLETCHER:  Your Honor, I don't want to

15   speculate into her mind, but I will say in the minute or --

16   the minute or so where she's on the floor is around the same

17   time where Jacob Chansley and other individuals are up at

18   the dais, where, you know, the Vice President had been

19   approximately an hour before, leading chants and praying

20   during that time.

21             THE COURT:  Okay.

22             MS. FLETCHER:  So turning to the 3553 factors and

23   starting with the nature and circumstances of the offense,

24   Your Honor is well aware of the unprecedential nature of

25   what happened on January 6, 2021.  These riots were not a

1     minor crime, nor were they a single incident, and it's

2     difficult to state the impact that that day and the actions

3     like those like Ms. Courtright have had on D.C., the

4     country, and our democracy as a whole.

5          Every person present inside the Capitol without

6     lawful authority on January 6th contributed to the chaos,

7     the damage, and the danger posed to law enforcement, the

8     Vice President, members of Congress, their staff, and so

9     many others.  And every person contributed to the

10    insurrection which sought to abort the certification of a

11    lawful and fair election.  Indeed, Ms. Courtright made it

12    all the way onto the Senate floor, the very physical space

13    where the certification should have been happening but for

14    the defendant and other rioters.

15          And the government would like to note that in the

16    scope of the thousands of people who were present that day

17    and the over 700 people charged, the government estimates

18    that about 50 to 60 people made it onto the Senate floor,

19    which is a relatively very small number compared to the

20    overall amount of people that were present that day.  And

21    even if Ms. Courtright only stepped onto that floor for a

22    minute, no rioter acted in a vacuum, and her presence in

23    that space and throughout the Capitol contributed to the

24    insurrection and made it that much harder for police to

25    regain control and keep people safe.

1          In addition to her intrusion on the Senate floor,

2     Ms. Courtright also picked up and walked around with

3     government property, that "Members Only" sign, and returned

4     it after only being instructed to do so by law enforcement

5     on her way out.

6          And Ms. Courtright compounded the seriousness of

7     what she did inside the Capitol by downplaying it on social

8     media after the fact.  Her posts falsely portrayed the level

9     of violence and showed a true lack of remorse for her

10    actions that day.

11          Looking at the history and characteristics of

12    the defendant, the defense is correct that to her credit

13    Ms. Courtright has been compliant while on pretrial release

14    and was willing to plead at the first available time and did

15    admit her conduct when she spoke to law enforcement,

16    including her entry onto the Senate floor.

17          THE COURT:  Okay.

18          MS. FLETCHER:  In looking at the need for a

19    sentence imposed as well as deterrence, Ms. Courtright's

20    conduct and deterrence, both general and specific

21    deterrence, weigh heavily on the government's

22    recommendation.  In every Capitol riot case deterrence and

23    the need to promote respect for the law weigh heavily in

24    favor of incarceration in these cases.  It's important to

25    convey to future rioters that actions have consequences and

1   that our justice system will indeed follow through on those

2   consequences.

3          For this specific defendant the government can

4   only hope that a period of incarceration will be sufficient

5   to deter any future criminal activity and make her think

6   long and hard about her actions that day, but also her

7   words, which downplayed and mischaracterized the

8   destruction, violence, and gravity of what happened on

9   January 6, 2021.  Her words, especially coupled with so many

10  other similar mischaracterizations, have caused real and

11  lasting harm.  And given that she has no criminal history,

12  the government does sincerely hope that this will be true

13  for Ms. Courtright.

14         Finally, looking at the need to avoid unwarranted

15  sentencing disparities, the government does discuss this at

16  some length in its memo but does want to note that the

17  breadth and scope of this investigation and this prosecution

18  into the events of January 6th is unique and unprecedented.

19  Even though hundreds of individuals have been charged, each

20  must be sentenced based on their own conduct and individual

21  characteristics with a view to the larger riot as well.

22         As Your Honor well knows, I don't want to get into

23  the government's internal deliberation, but evaluating each

24  case is a difficult process.  It's not just me or one

25  prosecutor making these decisions.  There is a painstaking

1    evaluation looking at many factors to make important

2    distinctions between offenders, and due to the myriad

3    factors in each case and the characteristics of each

4    individual defendant, it's impossible to make this a

5    science.  It is an art, but it is something that the

6    government has taken great pains, to make these comparisons.

7        Ms. Courtright is one of the first individuals who

8    have pled to and to be sentenced for the 18 USC 1752(a)(1)

9    charge -- and I only mention this to point out that there is

10   not yet a large pool of comparators for this specific

11   charge -- but --

12        THE COURT:  Did the government give her or

13   Mr. Abbenante an option, as it has, I understand, in other

14   cases, which of the charges to plead to?

15        MS. FLETCHER:  There was some discussion.  She was

16   not given the option to plead to the 40 USC 5104 charges.

17        THE COURT:  Very well.

18        MS. FLETCHER:  And in evaluating these

19   comparisons, the government does consider aggravating

20   factors, and Ms. Courtright's case presents a number of

21   aggravating factors.

22        When she entered the Capitol, she stepped over

23   broken glass.  She witnessed people trying to break into

24   doors and at one point, as seen in her Twitter post, was

25   near the front of a line of officers chanting at those

1    officers, and she is one of only a few people who were also

2    charged with 18 USC 641, the theft for taking the sign.

3              THE COURT:  Let me back up to your last point.

4    You say in your sentencing memo that she entered the

5    Parliamentarian doors on the west steps of the Senate about

6    20 seconds after others had struggled with Capitol Police.

7    I believe that's the word that you used.

8              In assessing whether, you know, she would have

9    seen, you know, direct hand-to-hand violence going on,

10   people breaking windows, people struggling with officers,

11   can you describe a little more as to what was actually going

12   on --

13             MS. FLETCHER:  Sure.  Yes, Your Honor.

14             THE COURT:  -- at the time and at the place that

15   she made entry.

16             MS. FLETCHER:  Yes, Your Honor.

17             So the door that she entered through CCTV video

18   does show somebody breaking a window, a few Capitol Police

19   or other law enforcement officers responding to that window,

20   people trying to go through the door --

21             THE COURT:  Within 20 seconds of her entering?

22             MS. FLETCHER:  Within 20 seconds of her entering.

23   But I will say that -- the government, you know, has no

24   specific evidence that she could see this, but -- I will say

25   her entry is pretty soon after this, but there were a number

1    of people in front of her, including someone wearing a large

2    panda head, which I imagine would obscure her view.  So the

3    government does not want to go so far as to say she must

4    have seen this, but when she did enter, there were people

5    who were grabbing, you know, signs trying to break into

6    doors as well as broken glass.

7           THE COURT:  And were the alarms going off and was

8    there tear gas?  Were there other indicators that this was

9    no peaceful protest?

10          MS. FLETCHER:  And, Your Honor, I don't know if

11   specific alarms were going off in that corridor.  I do know

12   at this time alarms were going off throughout the Capitol,

13   and in the video you can see Ms. Courtright at some point

14   bring up -- I don't know if it's a neck gaiter or a mask,

15   but she is covering her face as she enters inside, which the

16   government would submit may be indicia of the tear gas going

17   on.

18          THE COURT:  Okay.

19          MS. FLETCHER:  And as I mentioned, she was also

20   charged with 18 USC 641, the theft for taking the sign; but

21   most importantly her entry into a sensitive space, indeed

22   probably the most sensitive space imaginable on January 6th,

23   the Senate floor where the very certification should have

24   been taking place, sets Ms. Courtright apart from many

25   others and drives the government's sentencing request in

1    this case.

2              As noted in its memo, her actions of going onto

3    the Senate floor are analogous to others that have been

4    charged with a 1512(c)(2) such as Paul Hodgkins and Jacob

5    Chansley.  Although, to her credit, she remained on the

6    floor a much shorter time than them.  She did not go as far

7    into the chambers.  She was not one of the ones who went on

8    to the dais or anything.  From the government's video it

9    does appear she stayed near the entry doors of the gallery.

10   But she still was one of a number -- relatively small number

11   of people who made it onto the Senate floor.

12             And given these aggravating factors and others

13   laid out in the government's sentencing memo, the government

14   does request that you sentence Ms. Courtright to six months

15   of incarceration, a year of supervised release, 60 hours of

16   community service, and the agreed-upon restitution.

17             THE COURT:  Thank you.

18             MS. FLETCHER:  Thank you, Your Honor.

19             THE COURT:  All right.  Mr. Abbenante.

20             MR. ABBENANTE:  Yes, Your Honor.

21             THE COURT:  And I understand that you may be

22   somewhat under the weather.  If you need to take a break,

23   just give me the high sign.

24             MR. ABBENANTE:  No, I think I'll be fine.  Can I

25   take my mask off?

```
 1            THE COURT:  You may.

 2            MR. ABBENANTE:  Okay.  Your Honor, I think you

 3    know that it's my reputation to always try to be a straight

 4    shooter in the cases that I represent people.  I think I was

 5    very direct in my memorandum in what my position was.  I

 6    struggled with taking that position because I think -- in my

 7    heart of hearts I think really a period of home confinement

 8    would have been sufficient, but I understand the competing

 9    interests here.  But let me say this and try to just narrow

10    what I'm about to say.

11            First, we never disputed anything about what the

12    government said about Ms. Courtright's actions.  We viewed

13    the videos.  I don't think she was there and I don't think

14    the evidence supports that she was there when the windows

15    were broken initially in that area to allow her to go

16    through the door; but when she did go through the door,

17    you know, we could see that there was broken glass.  There

18    was at least one protester to her left that was banging on

19    the -- one of the doors, and she -- and here's what she's

20    doing.  She's like taking videos.  I mean, it's ridiculous.

21    I don't know what was going through her mind, but that's

22    what she was doing.

23            But as I said in my memo, she didn't come here to

24    Washington from Hurricane, West Virginia, to subvert

25    democracy or to, you know, participate in any kind of
```

1    overthrow of the government.  She never even expected to go

2    to the Capitol.  She was going to see President Trump.  And

3    she got really excited because when she arrived at that

4    location the people that were handling the seating

5    arrangement ushered her in, and she got a very close seat.

6    She saw the President and got very excited.  And when

7    everybody got up and he said, "Go to the Capitol," she, you

8    know, went and marched.

9            And she's admitted all that.  She admitted all

10   that to the probation department, and just like Your Honor

11   pointed out and Ms. Fletcher -- Ms. Fletcher -- Your Honor,

12   I don't have any beef with Ms. Fletcher.  She's been nothing

13   but forthcoming with all the discovery.  We just disagree on

14   what the sentence should be here, okay?

15           THE COURT:  I have no reason to doubt that.

16           MR. ABBENANTE:  No.

17           THE COURT:  Do you know how many January 6th

18   defendants stand up and tell me I had no intention of

19   overthrowing the government, but I just got swept up in the

20   moment?

21           MR. ABBENANTE:  Right.  I understand it.  It is

22   what it is.  I'm not saying it's an excuse.

23           But she went into the Capitol.  She was there for

24   a brief period of time.  There's no evidence that she

25   engaged in any kind of violence or -- with any of the

 1    officers or she destroyed any property.

 2            And yes, she picked up the "Members Only" sign and

 3    walked around with it but offered no resistance when the

 4    police officer -- the Capitol Police officer asked her to

 5    return it; she returned it.  And as Your Honor pointed out

 6    and as Ms. Fletcher admitted, that when she was interviewed

 7    by law enforcement she admitted that -- you know, she said

 8    she stepped onto the Capitol -- I mean, onto the Senate

 9    floor, but there was no evidence to support that.  And to be

10    honest with you, I don't even know -- you can ask

11    Ms. Courtright.  I think when she was standing there she

12    wasn't really even sure where she was.

13            But she was there with the "Members Only" sign.

14    We don't dispute that.

15            What I have a problem with is this.  In their memo

16    they sort of suggest and they make reference to a case that

17    you're well familiar with, the *Jennifer Ryan* case, and they

18    say it presents aggravating factors involving social media

19    like the instant case.  In *Ryan*, the defendant, like

20    Defendant Courtright, made a number of comments on various

21    social media platforms minimizing and denying the violence

22    that occurred and her actions.  In addition to displaying a

23    lack of remorse, these type of social media posts spread

24    misinformation.

25            True.

1          But Ms. Courtright did all this on January 6th,

2     and when she responded in all of these ways about the infamy

3     and, you know, being proud to be there, this kind of thing,

4     she was responding to people who were blowing up her

5     Instagram.

6          I don't -- I'm not the person to ask about all the

7     social media nonsense, but the bottom line is she's, you

8     know, seeing all this stuff coming in.  She's trying --

9     she's responding.  She's not even thinking about what she

10    said.

11         She leaves the Capitol, and she sees -- goes back

12    to her hotel, sees all this on TV and then it hits her like,

13    oh, my God, you know, what did I get involved in here?  She

14    goes home, and her parents were furious.

15         From January 6th she's never made a single posting

16    or spoken to anybody, made any comments about January 6th.

17    Ms. Ryan, on the other hand --

18              THE COURT:  I'm well aware --

19              MR. ABBENANTE:  We don't need to go through that.

20         Then they refer to Jessica Bustle in the case in

21    front of Judge Hogan, and in Ms. Bustle's case, what she

22    does -- she came to Washington prepared to fight, to do

23    whatever they were going to do to, you know, stop the steal.

24    On Facebook before the riot she said, "We don't win sitting

25    on the sidelines.  The Vice President is a traitor."

1          And even after the riot she said it, and then even

2     several days before she was eventually arrested, as I

3     understand it, she said, "We need a revolution."  Those are

4     the people, I would submit to the Court, where the social

5     media posts that they made really reflect on the kind of

6     person they actually are.

7          Ms. Courtright -- a foolish young lady, foolish

8     young lady -- didn't even vote in the election, had no

9     political agenda, got caught up in all this, and she's here

10    today.  And what has she done since then?  She's cooperated

11    fully with everyone in connection with the case.  When she

12    was debriefed after the incident, we did it by video.  She

13    appeared in West Virginia with the agent that was assigned

14    to the case.  She sat there and answered all the questions

15    truthfully, admitted to being on the Senate floor, never

16    shirked away from it, okay?

17         And when the Court -- when the government cites

18    cases like the *Ryan* case where Your Honor gave that person

19    60 days, and *Bustle* when Judge Hogan give 60 days home

20    confinement and the other conditions, I can't understand nor

21    do I think it's justifiable that they come in here -- the

22    government comes in here and asks you to give her the high

23    end of the guidelines of six months because she stood on the

24    floor of the Senate for a minute, left -- no violence and

25    left the Capitol.

1        As far as consequences are concerned, she deserves

2   the consequences that she's faced as a result of this, but

3   she's going to have to live with them the rest of her life.

4   Everywhere on social media, you know, you can't -- all these

5   young people -- I mean, people -- even my clients, they come

6   in and they Google me, you know, and they find out, you

7   know, all the stuff about me.  That's what young people do.

8   That's what employers do.  And that's going to be with her

9   the rest of her life.  Everything is going to be right out

10  there.  She's going to make a statement to you, and she's

11  going to tell you some of those things that she's faced

12  since the case has been pending.

13       But that's with her the rest of her life.  She's

14  always going to be dealing with this with potential

15  employers.  She was on the dean's list.  Her whole future is

16  affected by this.  That's a consequence for a first offender

17  that is tremendous, and it doesn't -- I don't think it's

18  fair for the government to take the approach that in

19  addition to all this, for a nonviolent person with no record

20  who has fully cooperated, to give them six months in jail.

21       As I said, you know, I struggled with coming up

22  here and deciding whether or not to, you know, just take the

23  position of home confinement, but I recognize that in the

24  scheme of things -- and we have it in all of our cases in

25  federal court where we have -- like, even a drug case where

1     there's like related conduct, or we have a fraud case and

2     there's some related conduct.  It's not charged.

3               And I'm not even sure -- you know, this is a thin

4     line, but I don't even know whether or not there -- it

5     constituted -- what she did really would have held up as

6     obstruction.  But it is -- it is true.  It is related

7     conduct.  Okay?

8               Having the sign there and standing in front of the

9     sign.  I get it.  It's a bad look.  But is it a look that

10    deserves six months?  That's the issue here, okay?

11              So in balancing all that -- and then

12    there's another factor here.  You know, I don't want the

13    social media -- I mean, I can't tell you how many news

14    outlets and people have contacted me wanting to talk to

15    Ms. Courtright or talk to me, and we've refused every single

16    request.  But I certainly don't want -- and I know they're

17    listening now -- for the media to say that Ms. Courtright

18    has not been punished for what she's done in this case,

19    because she has.  She has been punished already just by

20    virtue of the fallout from what happened here in this case.

21              I don't think she needs to be sent to jail for six

22    months.  I would suggest, if the Court is inclined to give

23    her jail time, that the amount of time that Your Honor

24    should impose should not exceed that recommended by the

25    probation department.

1          In addition, she's an excellent candidate for

2    voluntary surrender.  I would ask that the Court order that.

3          She is from West Virginia.  I tried to find

4    out from the probation department -- not the probation

5    officer who is here, but before this I tried to find out

6    from Ms. Moses-Gregory and a couple of other people how the

7    BOP was handling, you know, placement for people with

8    misdemeanor cases who are serving a minor sentence, be it a

9    month or six months, whether they're not -- how they're

10   handling it.  So that question is a little bit unclear, but

11   I think the same procedures that Your Honor usually utilizes

12   is that "make a recommendation," and I would ask you to make

13   the recommendation that Ms. Courtright be designated, if

14   your Honor imposes time, to Alderson, West Virginia -- it's

15   about an hour and a half to two hours from her home -- or

16   any other facility -- because I understand sometimes the BOP

17   has contract facilities for local jails, any other facility

18   that the BOP has that could house her near her family in

19   West Virginia.

20         THE COURT:  Okay.  Probation includes a mental

21   health treatment condition in their recommendation.  Any

22   objection to that?

23         MR. ABBENANTE:  No.  I think this whole situation

24   has had some effect on Ms. Courtright.  I think she can

25   benefit from it.  I don't think it's going to involve any

1    long term treatment, but it's not going to hurt because this

2    has been quite an experience for her as well as the other

3    things that have been mentioned in the presentence report.

4         And unless you have any questions, Your Honor, I'm

5    finished.  Thank you.

6         THE COURT:  No.

7         All right.  Ms. Courtright, what do you want to

8    tell me?  Step right up.

9         THE DEFENDANT:  I'm sorry that I'm going to read

10   from a piece of paper.

11        THE COURT:  All right.  Just take a deep breath.

12   Compose yourself.  No rush.

13        (Pause)

14        THE COURT:  I'll tell you what.  Why don't we take

15   five, and we can --

16        THE DEFENDANT:  I'm going to pass out.

17        MR. ABBENANTE:  Your Honor, could we take a break?

18        THE COURT:  Let's take five.

19        Courtney, if you could summon the nurse, please.

20        MR. ABBENANTE:  Let's see if you can sit in the

21   chair.  Why don't you sit right in the chair, okay?

22        I think I'm going to read her statement for her.

23        THE COURT:  We're off the record.

24        (Recess taken)

25        MR. ABBENANTE:  Good morning again, Your Honor.

1   The nurses came up, and they've checked Ms. Courtright out,

2   and she's fine.  The only thing I would ask of the Court --

3   I know you would prefer if she stood at the lectern -- if

4   she could possibly just read her statement to you while

5   she's sitting down.  I think that would prevent any further

6   problems.

7           THE COURT:  That would be fine.

8           Ms. Courtright, are you feeling okay?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  All right.  Go ahead.

11          THE DEFENDANT:  Good morning, Your Honor.  I have

12  thought about this moment for a long time.  Ever since our

13  first hearing together, every single night before I go to

14  bed I stay up for hours thinking about exactly what I would

15  get to say to you given the opportunity.

16          First, I would like to address my family.  Words

17  are not enough to ever tell you -- Dad, Mom, Morgan,

18  Grandma, Paw Paw -- how sorry I am.  If I could take back

19  anything in my life, it would be my actions on January the

20  6th.  I know my actions have caused so much shame to the

21  most important people in my life, but I will have to live

22  with this for the rest of my life.  I'm sorry for the

23  embarrassment I have caused you all to share with me for

24  what I have done.

25          I would also like to express my remorse to you,

1    Your Honor, and everyone in this courtroom.  My parents

2    didn't raise me to be a trespasser on someone else's

3    property.

4        I stand before you this morning knowing that I

5    have no one else to blame except myself.  I have so much

6    shame from this.  I even hold my head down and don't make

7    eye contact with my neighbors when I see them driving on our

8    road in fear of what they may think of me.  I will never be

9    the same girl again.  This has changed me completely.

10        Since this has happened, I haven't returned any

11   news media attempts or journalists' calls to try to get

12   ahold of me.  I have not posted on my social media speaking

13   about January 6th since I returned home although all I

14   wanted to do was apologize on my social media accounts for

15   thinking anything about January 6th and me being there was

16   somehow cool.  I had already deactivated my accounts.

17   Through my license, the amount of hate and threats continued

18   as well as false statements and ugliness about my character.

19   I now have overwhelming fear in my own hometown for what

20   they may think of me.  I hate when I have to say my name out

21   loud, and when someone new asks me my name I have to answer

22   so I whisper "Gracyn Courtright" so nobody around here has

23   any certain encounters, like --

24        THE COURT:  Ma'am, slow down a little bit so the

25   court reporter can pick up what you say, okay?  Go ahead.

1          THE DEFENDANT:  -- certain encounters, like when

2     you check out at a store and they ask you for your email and

3     phone number have become almost unbearable for me.  The

4     whole time I'm thinking:  Do they recognize me?  What do

5     they think of me?

6          I've cried a lot alone in my room.  I was a 23-

7     year-old girl who made the single, most unexplainable,

8     biggest mistake of my life.  I would do anything to have

9     never been anywhere close to Washington, D.C., on January

10    the 6th because then I wouldn't be in the worst position of

11    my life.

12         Your Honor, I would ask that I be given the

13    opportunity to go back to school and finish my last semester

14    of college.  I will forever have the fear of applying for

15    jobs knowing the instant they Google my name they will not

16    see the hard-working student who has been on the dean's

17    list.  They will not see the girl that I know that I still

18    am.  They will only see the girl who trespassed in the

19    nation's Capitol and took pictures to prove she was there

20    and posted pictures thinking that she was just so cool.

21         I have already hurt myself in the future more than

22    I have ever dreamed possible in about 20 minutes.  I hope to

23    have the opportunity to some day be a better version of

24    myself than I was on January the 6th.

25         Thank you, Your Honor.

1          THE COURT:  Okay.  So let's just have a brief

2     conversation.  I appreciate your comments.  I think they are

3     heartfelt.  I take you at your word for what you have been

4     thinking for the last almost year.

5          But I guess my main questions relate to what were

6     you thinking then.  You know, why did you do what you did?

7     Why did you post the posts that you did?  And just tell me

8     in your own words.

9          THE DEFENDANT:  So I posted the post because --

10    like did you ask why I posted the post?

11         THE COURT:  Why you went into the Capitol and onto

12    the floor to begin with, and then why did you post the posts

13    afterwards?

14         THE DEFENDANT:  Okay.  I went into the Capitol

15    because I just followed the crowd, and I was looking in and

16    out of places inside the Capitol.  I was walking around, and

17    I walked into the room not knowing what it was.  And I went

18    home that evening and Googled like what the Senate floor and

19    what the House chambers were because I didn't know that that

20    was the room that I was in.

21         And I posted the post because I didn't understand

22    like where all this was headed just yet.  Like I didn't

23    realize what I had done was so horrible just in that moment,

24    and so I was just trying to defend myself.  I just couldn't

25    take any more of the people telling me I was a horrible

1    person so I just wanted to defend myself, but like I

2    understand that I am a horrible person.

3             THE COURT:  When you went into the building, did

4    you know that you were on the Senate side as opposed to the

5    House side?

6             THE DEFENDANT:  No, I had no idea.

7             THE COURT:  Okay.  And did you know that it was

8    the Senate floor when you saw the chairs?

9             THE DEFENDANT:  I had no idea.

10            THE COURT:  Okay.  You know who Ashli Babbitt is,

11   right?

12            THE DEFENDANT:  Oh, yes.

13            THE COURT:  Okay.  You entered the building at

14   2:40.  Do you know what time Ashli Babbitt entered the

15   building?

16            THE DEFENDANT:  No, Your Honor.

17            THE COURT:  2:42, okay?  So when -- she was killed

18   at 2:42, all right.  She was on the House side trying to

19   climb through a window.  You went in on the Senate side.

20            And did you know what was on the other side of

21   some of those doors that you saw people trying to break

22   down?

23            THE DEFENDANT:  No, Your Honor.

24            THE COURT:  So you see my point, right?  That that

25   could have been you --

```
1              THE DEFENDANT:  Uh-huh.

2              THE COURT:  -- had you gone into a different door

3     or tried to climb through a different window --

4              THE DEFENDANT:  Uh-huh.

5              THE COURT:  -- or followed a crowd in a different

6     direction, and that's why it was such a dangerous place to

7     be.

8              Do you know how many people died on January 6th?

9              THE DEFENDANT:  I forget the number, but I know.

10             THE COURT:  Five --

11             THE DEFENDANT:  Yes.

12             THE COURT:  -- okay, including Ms. Babbitt.

13             Do you know how many Capitol Police officers

14    committed suicide after January 6th in part most likely from

15    the trauma that they suffered that day?

16             THE DEFENDANT:  I know they have, but I don't know

17    the number, Your Honor.

18             THE COURT:  Four.

19             So was it cool to have been there?

20             THE DEFENDANT:  No.

21             THE COURT:  Okay.  Since we've talked about a lot,

22    each one of these cases is different.  We have hundreds of

23    them.  As Ms. Fletcher said, sentencing is more of an art

24    than it is a science.  We've discussed at length what your

25    involvement is.  I don't think there's much dispute as to
```

1    what your involvement is.

2             I agree that entering the Senate floor is a

3    relevant factor in the analysis in general because it

4    reflects a -- it could reflect a deeper commitment to the

5    overarching purpose of the riot that day, which was to

6    disrupt the certification of the vote, but I've concluded

7    that you didn't know where you were, all right, or the

8    significance of what was going on or why it was such a

9    serious affront to democracy to intrude and denigrate the

10   Senate chamber in the way that people did, and you were only

11   there for a minute or two at most.

12             That said, I don't buy, necessarily, that you were

13   trying to find a place to charge your cell phone.  I mean, a

14   Starbucks would have done the trick, if that were the goal.

15             But your cluelessness and your less serious

16   involvement does not mean that your conduct was not serious.

17   Obviously you've pled guilty to a federal crime.

18             And the U.S. Capitol is not just any restricted

19   building.  And beyond that, you took part knowingly in

20   something much more serious, much more dangerous than just

21   stepping into the Capitol for 22 minutes or whatever it was.

22             And as I said with respect to what happened to

23   Ms. Babbitt, it was potentially very dangerous.  You know,

24   there were other people on the other side of some of those

25   locked doors that were being banged on and the people were

1    attempting to break down.  Luckily, because of coronavirus,

2    there weren't as many staffers and members there, perhaps,

3    than there might have been otherwise, but, you know, there

4    were some folks just about your age, you know, congressional

5    staffers, who were on the other side of those doors thinking

6    that, you know, they'd better call their family because this

7    may be it.

8         I don't know exactly what you saw when you went

9    in, but it seems to me that, you know, you probably saw

10    enough to know that this wasn't a simple peaceful protest

11    based on, you know, people wearing flak jackets and camo and

12    what they were saying and what they were doing in front of

13    you and the broken glass and the alarms and the smoke and

14    all of that.  I think, you know, anyone thinking about it

15    would have known that this was no peaceful protest and that

16    violence was a possibility at least.

17         And I get that, you know, there may have been

18    police officers there that didn't take action when you came

19    in, but that was because there was a mob, right?  And they

20    were overrun, and they weren't in a position to stop

21    everyone.  And the fact that they showed fairly remarkable

22    restraint that day saved the lives of a lot of other people.

23    There could have been many more than the four or five who

24    died that day.  And each person who went in is responsible

25    for the power of the mob.

1    In terms of your remorse, you know, it is

2    sometimes very difficult to, you know, distinguish between

3    folks who are truly remorseful from folks who are remorseful

4    only because they got caught and are standing in front of a

5    federal judge.  But I accept what you've said today, and I

6    think that it is heartfelt.

7    We also have to take into account the personal

8    history, the background, of the defendants that we sentence.

9    You know, you're very young.  You may not be the youngest

10   January 6th defendant, but you're among the youngest, and

11   coming from someone who has a 21-year-old son, I know that

12   decision-making does not always comport with one's true

13   character.  I don't know you, but I've read enough about you

14   in your presentence report to have formed some views on

15   that.

16   By the same token, you have had a lot of

17   advantages.  You come from a solid, professional, supportive

18   family.  You've achieved academically.  You're well on your

19   way to a college degree, and because of that, frankly, I

20   would have expected a little more of you, okay, in terms of

21   thinking for yourself, not just following the crowd, and

22   knowing right from wrong.

23   And on that point, Mr. Abbenante mentioned that

24   you did not vote.  That is your choice, obviously, but in my

25   view, if you, or any citizen for that matter, wants to

1    participate in our democracy or get involved in government

2    or politics, casting an informed vote is the price of

3    admission.  That's the ticket to ride, okay?  Because when

4    you do that, you actually have to study the issues and the

5    candidates, learn what their policies are, figure out how

6    those policies will affect you and your family and your

7    community and your state and the nation, whatever the case

8    may be; what kind of people they are, what experience they

9    have, what their values are, whether they're competent or

10   not, okay?  That's what it means to participate in a

11   democracy.  It's not like going to a UK basketball game and

12   rooting for one team just because of the color of their

13   jerseys, okay?  It's not sports.  And it's certainly not

14   resorting to violence when your team doesn't win the game,

15   okay?

16          Finally, I will note that you've already had some

17   challenges in your life, some -- you know, a couple of

18   physical ones, some psychological ones that we don't need to

19   get into, but sometimes a life-altering event like this can

20   be an opportunity to confront some of those issues, all

21   right, and so I think the probation's recommendation for a

22   mental health at least screening or some sort of assessment

23   is an appropriate one in this case.

24          As I said, taking into account all of these

25   factors, it is more of an art than a science.  To

1    Ms. Fletcher's point about the process within the Justice

2    Department of coming up with their recommendations, my

3    experience has been that they have been very responsible and

4    thoughtful and deliberate about the recommendations that

5    they have made, but in this case I think that that

6    recommendation has overshot the mark a little bit.  No

7    offense to Ms. Fletcher.  I'm sure there was a process that

8    was gone through.  And so under all of the circumstances, I

9    will accept the recommendation of probation and the defense

10    in this case.

11        So with that, pursuant to the Sentencing Reform

12    Act of 1984 in consideration of the provisions of 18 USC

13    3553 as well as the sentencing guidelines, it is the

14    judgment of the Court that you, Gracyn Dawn Courtright, are

15    hereby committed to the custody of the Bureau of Prisons for

16    a term of one month on Count 1.  You are further sentenced

17    to serve a supervised release term of 12 months.   In

18    addition, you are ordered to pay a special assessment of

19    $25.

20        While on supervision, you shall abide by the

21    following mandatory conditions as well as the standard

22    conditions of supervision, which are imposed to establish

23    the basic expectations for your conduct while on

24    supervision.  These mandatory conditions include:  You must

25    not commit another federal, state, or local crime.  You must

1    not unlawfully possess a controlled substance.  You must

2    refrain from any unlawful use of a controlled substance.

3    You must submit to one drug test within 15 days of placement

4    on supervision and at least two periodic tests thereafter as

5    determined by the probation office.  You must make

6    restitution in accordance with the relevant statutes or any

7    other statute authorizing a sentence of restitution.

8            You shall also comply with the following

9    conditions:

10            Mental health treatment.  You must participate in

11    a mental health treatment program and follow the rules and

12    regulations of that program.  The probation officer, in

13    consultation with the treatment provider, will supervise

14    your participation.

15            I'm going to impose a reentry progress hearing.

16    About four months after your release I want you to come

17    back.  We can do it virtually.  I want to hear how things

18    are going.  I do this in a number of my cases, and I think

19    this is an appropriate one, and it will be an opportunity

20    for us just to have a conversation to see how things are

21    progressing, okay?

22            You must also complete 60 hours of community

23    service within the next six months or within six months of

24    your release.  The probation officer will supervise the

25    participation in the program by approving the program.  You

1    must provide written verification of completed hours to the

2    probation officer.

3            The Court finds that you do not have the ability

4    to pay a fine and therefore waives imposition of a fine in

5    this case.

6            The restitution is to be made payable to the

7    Architect of the Capitol in the amount of $500.  The Court

8    determines that you do not have the ability to pay interest

9    and therefore waives any interest or penalties that may

10   accrue on this balance.  Restitution payments may be made to

11   the -- will be made to the Clerk of the Court for the United

12   States District Court for disbursement to the following

13   victim:  The Architect of the Capitol.  And the address will

14   be in the order.  You must pay the balance of any

15   restitution owed at a rate of no less than $50 each month

16   and provide verification of same to the probation office.

17           Financial information disclosure.  You must

18   provide the probation officer access to any requested

19   financial information and authorize the release of any

20   financial information.  The probation office may share

21   financial information with the U.S. Attorney's Office.

22           You must not incur new credit charges or open

23   additional lines of credit without the approval of your

24   probation officer.  Again, the financial obligations are --

25   the special assessment is immediately payable to the Clerk

1    of the Court.

2           The probation office shall release the presentence

3    investigation report to all appropriate agencies, which

4    includes the United States Probation Office in the approved

5    district of residence in order to execute the sentence of

6    the Court.  Treatment agencies shall return the presentence

7    report to the probation office upon the defendant's

8    completion or termination from treatment.

9           The Court will recommend a designation to either

10   Alderson, West Virginia, or another facility in proximity to

11   your home.

12          You have the right to appeal the sentence imposed

13   by the Court if the period of imprisonment is longer than

14   the statutory maximum or the sentence departs upward from

15   the applicable sentencing guidelines range.  If you choose

16   to appeal, you must file any appeal within 14 days after the

17   Court enters judgment.

18          You also have the right to challenge the

19   conviction entered or the sentence imposed if new and

20   currently unavailable information becomes available to you

21   or on a claim that you received ineffective assistance of

22   counsel in entering your plea of guilty to the offense of

23   conviction or in connection with this sentencing.  If you

24   are unable to afford the cost of an appeal, you may request

25   permission from the Court to file an appeal without cost to

1    you.

2                  Any other objections to the sentence?

3                  MR. ABBENANTE:  None, Your Honor.

4                  THE COURT:  Ms. Fletcher?

5                  MS. FLETCHER:  No, Your Honor.

6                  THE COURT:  Okay.  And the government will move to

7    dismiss the remaining charges?

8                  MS. FLETCHER:  Yes, Your Honor, the government so

9    moves at this time.

10                  THE COURT:  So ordered.

11                  MR. ABBENANTE:  And I would ask, Your Honor, that

12   you allow her to voluntarily surrender.

13                  THE COURT:  So ordered.

14                  Ms. Courtright, I don't know what your situation

15   is with UK.  I know you have a meeting coming up.  You know,

16   obviously the first order of business is to complete your

17   degree somehow, whether it's at UK or someplace else.  I

18   tell many of my defendants that they should not be judged by

19   the worst mistake that they make in their life, and I hope

20   that you can -- I hope that applies to you and that you will

21   be able to overcome some of the byproducts of what you've

22   managed to get yourself into, okay?

23                  Anything else?

24                  MR. ABBENANTE:  No, Your Honor.  Thank you.

25                  THE COURT:  Good luck.

1          MR. ABBENANTE:  Have a good holiday, Your Honor.

2                (Whereupon the hearing was

3                concluded at 11:15 a.m.)

4

5          **CERTIFICATE OF OFFICIAL COURT REPORTER**

6

7          I, LISA A. MOREIRA, RDR, CRR, do hereby

8     certify that the above and foregoing constitutes a true and

9     accurate transcript of my stenographic notes and is a full,

10    true and complete transcript of the proceedings to the best

11    of my ability.

12       Dated this 28th day of December, 2021.

13

14                              /s/Lisa A. Moreira, RDR, CRR

15                              Official Court Reporter
                                United States Courthouse
16                              Room 6718
                                333 Constitution Avenue, NW
17                              Washington, DC 20001

18

19

20

21

22

23

24

25